**STATE ex ALBRIGHT et v HABER et**

Ohio Appeals, 2nd Dist, Darke Co

No 584. Decided June 31, 1941

George W. Porter, Greenville, and Wilbur D. Spidel, Greenville, for plaintiffs.

Richard E. Hole, Prosecuting Attorney, Greenville, for defendants, Board of Trustees of the Children's Home of Darke County.

**OPINION**

By HORNBECK, J.

This is an action seeking a writ of mandamus commanding the defendants, the Trustees of the Children's Home of Darke County, Ohio, to restore plaintiffs to their positions as Superintendent and Matron, respectively, of the Children's Home of Darke County, Ohio, as of March 1, 1940, and to issue a voucher to the defendants for their salaries from that date.

The petition avers the appointment of plaintiffs as Superintendent and Matron of the Children's Home of Darke County on May 1, 1927, and service in that position until March 1, 1940; that the appointments were made under the Civil Service Laws of the State of Ohio and that the plaintiffs were so classified. It is further averred that on February 12, 1940, the defendants, members of the Board of Trustees of the Children's Home, Darke County, by resolution discharged the plaintiffs from their respective positions, "alleging in said resolution that the said Henderson M. Albright was guilty of embezzling an indeterminate amount of money from a fund known as the Harman Foundation Fund", said discharge effective March 1, 1940; that at another meeting on the same night, namely, February 12, 1940, said trustees appointed E. E. Dininger and wife as Superintendent and Matron of said Children's Home and that the Diningers, together with the trustees of the Home on March 1, 1940, compelled the plaintiffs, against their will, to vacate and leave said institution. It is further averred that defendant trustees forwarded a copy of the aforesaid resolu-

tion to the State Civil Service Commission which refused to recognize the resolution as a discharge of plaintiffs and, thereupon, defendant, Charles Haber, by mail, falsely and fraudulently informed said commission that these plaintiffs had relinquished their positions and had failed to report and perform their duties as Superintendent and Matron of said institution; that thereupon the Commission placed the names of Mr. and Mrs. Dininger on the Civil Service payroll, as Superintendent and Matron of said Children's Home.

It is further alleged that thereafter on February 23, 1940, certain of defendant trustees appeared before the grand jury of Darke County, Ohio, and that thereafter plaintiff, Henderson M. Albright was indicted, charged with embezzling the sum of $126.00 from the Harman Foundation Fund, placed under arrest. later tried and acquitted of date, May 2, 1940; that said plaintiff by reason of the indictment and trial had been under duress and unable to protect his rights to said position as Superintendent of the Children's Home; further averred that since the acquittal, plaintiff has requested defendant Board of Trustees to reinstate him in his former position and the defendant Civil Service Commission to reinstate him upon the payroll of said commission, which requests were refused.

It is averred that the defendant trustees of the Children's Home of Darke County, in discharging the plaintiffs, failed and neglected to proceed as provided in §486-17a GC, that no order of removal was made by said trustees and no copy of said order with reasons therefor served on plaintiffs and no reasonable time fixed within which plaintiffs could make and file any explanation and no order with any explanation filed with the Civil Service Commission of the State; that by reason of such failure of the Board of Trustees, plaintiffs were deprived of the right to make explanation and to appeal said cause to the Civil Service Commission of the State of Ohio.

Defendant trustees of the Children's Home answer and by way of first de-

fense, after admitting the formal averments of the petition, deny generally all other allegations thereof. By the second defense it is alleged that prior to February 12, 1940, S. K. Armstrong, an examiner from the Bureau of Inspection, upon examination found shortages in said accounts of the plaintiff, Henderson M. Albright; that when confronted with said shortages, he admitted that he had used money belonging to the Harman Trust Fund, also money belonging to the county and to the children for his personal use and that he had misappropriated between five and six hundred dollars; that the board, after learning the facts, met with plaintiffs, discussed with them the affairs and conditions of the Children's Home and that plaintiffs agreed to repay to the Children's Home all the money wrongfully appropriated and to secure the payment thereof, plaintiff delivered to said board a life insurance policy on the life of plaintiff, Myrtle L. Albright, and assigned to said board the cash surrender value of said policy; that at said meeting certain members of the board told plaintiffs that they would have to leave the positions which they were serving and that plaintiffs at said time agreed to leave said position but asked the privilege of remaining until the first of March, 1940; that thereafter at said meeting, the board passed a resolution removing the defendants as Superintendent and Matron of the Home, effective March 1, 1940, and set out as reasons for their removal in substance as alleged in the petition; that on February 17, 1940, said board by registered mail served a copy of aforesaid resolution upon the plaintiffs and filed a copy thereof with the Civil Service Commission; that on February 13, 1940, plaintiff, Henderson M. Albright. in writing made a statement. to Armstrong, the State Examiner, that he had misappropriated and mishandled certain funds belonging to the county and Board of Trustees, amounting to between five and six hundred dollars and on February 16, 1940, made a further statement in writing that he had misappropriated certain

other monies belonging to the children of said Home; that on March 1, 1940, plaintiffs vacated the Home without doing anything further upon the action of the Board of Trustees or the Examiner, S. K. Armstrong; that no explanation of the charges against plaintiff, Henderson M. Albright, was made except those made to Armstrong, the examiner, in which he admitted the misappropriation of funds; that he made no appeal to the Civil Service Commission from his removal by the Board of Trustees.

The reply of plaintiff avers that when Armstrong, the examiner, represented to the plaintiff that he had embezzled certain monies belonging to said Home all the books containing the accounts of said Home were in the possession of Armstrong; that plaintiff did not have complete knowledge of the transactions upon which the accusations were based and upon later and more complete investigation, plaintiff found that the accusations were not true and that he was not guilty of embezzlement and that he assigned the insurance policy to the trustees of the Home, relying upon the statements of Armstrong; further averred that the Harman Fund did not belong to the county but was willed to the trustees of the Children's Home for the use of the children who lived in said Home; that no instructions were given to plaintiff by the trustees as to what should be done with the income collected by the plaintiff, other than said money was to be used for said children and that he had used said income for the benefit of the inmates of said Home without instruction from the board.

Reply denies each and every other material allegation of the answer.

We have set forth at considerable length the pleadings of the parties for the purpose of disclosing the various issues raised thereby. The ultimate question for determination is simple, although, many transactions, the subject of the pleadings, are involved.

The controlling issue is whether or not the plaintiffs resigned their positions as Superintendent and Matron of the Darke County Children's Home, or acquiesced in their removal or whether they were removed against their will and denied the protection of §486-17a GC. There is also the further question which is always presented in mandamus actions, if plaintiffs have established a clear right to the writ and whether or not the court order under all the circumstances appearing should grant the order sought.

The record is not crystal clear on many of the matters in dispute but from it there may be gleaned the following conclusions which, in our opinion, are well supported. The plaintiffs were appointed jointly, took the examination for the respective positions as husband and wife and received their rating as joint applicants. They had served in their respective capacities for a number of years prior to the time and were, or should have been thoroughly conversant with their obligations to the Board of Trustees. Plaintiff, Henderson M. Albright, should have known that respecting the handling of funds as Superintendent he served in a fiduciary relationship and that as to all of such funds, no matter where the title may have rested, he was but an agent and such funds should have been so considered and handled.

An examiner of years' experience came on to the ground to inspect the records and check the funds of the Darke County Children's Home. It is claimed that the plaintiffs did not have access to these records but this contention is not well made because there is no proof whatever, that either plaintiff was denied access to the books, files, receipts and papers of the Home and prior to the time that the examiner took them for inspection, they were in the possession of the plaintiff, Henderson M. Albright. As a result of the examination, Mr. Armstrong determined that there was a shortage in the funds of the institution and during the examination conferred with Mr. Albright and at the conclusion thereof informed him of the findings that were made. Without respect to any criminal offense on the part of Mr. Albright,

one can not read this record without being convinced that there were serious irregularities in the handling of the funds of the Home and some shortage, at least, was admitted by Mr. Albright.

We shall not undertake to be specific respecting these irregularities but one instance in particular is convincing that Mr. Albright was not, in his relation with the examiner, frank in explaining the transactions under consideration and did not accord to the examiner the assistance which he had a full right to expect from the Superintendent of the Home. We refer to the $66.00 received as interest from the Harman Fund from Harvey B. Hole. Mr. Armstrong states that Mr. Albright said that he would put this money into the account in the People's Savings Bank at Greenville after Armstrong had concluded his examination. Mr. Armstrong informed him that he must make the deposit immediately, which Mr. Albright promised to do. When the examiner went to the People's Savings Bank, he found no deposit as was agreed. He then took the matter up with Mr. Albright who said that he had placed the money to his personal account and would check it over to the Harman Trust Fund. Upon inquiry it was found that no such deposit had been made to Mr. Albright's personal account. He was then again questioned and said that he thought he had put this money in the Greenville National Bank and in stating that he had put it in the People's Bank he was mistaken. Thereupon the examiner went to the Greenville National Bank and learned that no deposit had there been made. Further inquiry elicited the response that the money had been placed in a deposit box of the Greenville National Bank and when it was proposed that Mr. Albright go with the examiner to this deposit box, Mr. Albright said, "Well, I might as well tell you that it isn't in the box in the Greenville National Bank." All of these conversations occurred within a short period of time. This testimony was not denied.

Following the examination and findings by Mr. Armstrong, the transactions were taken up with the Prosecuting Attorney of Darke County at the instance of the plaintiffs. As a result of this interview the insurance policy was assigned to the Board of Trustees to make good the amount of any shortage that might eventually be determined. Thereafter Mr. Albright, individually, or through his counsel, made payments to the Board of Trustees in four different amounts, aggregating the sum of $586.89.

As a result of the interview with the Prosecuting Attorney and his instructions to the Board, no doubt the subsequent action of the Board was shaped. On the night of February 12, 1940, the Board met but prior to that time its members had been in conference with the Prosecutor and the Albrights and it appears and may be inferred, that the transactions under consideration had been discussed at length. So that, when the Board convened, the members thereof, as well as the plaintiffs, were cognizant of the general purpose of the meeting.

Much time and testimony is devoted to determining the chronology of the occurrence of events of this meeting. It makes little difference but it is reasonable to conclude from the whole record that the Board definitely intended to discharge the Albrights and possibly, though not probably, had taken such action before they came into the meeting. but in all probability, the time when they were to leave the institution was not fixed until their coming into the meeting.

The crux of this case, in our judgment, is found in that which occurred and the statement made at the time when the Albrights came into the Board meeting. Every member of the Board who testifies states that Mrs. Albright, in the presence of her husband, said in substance as they came into the meeting, "We know we are going to leave, we have to leave, but we ask for an extension of time", and stated that they could get out by the first of March. Thereupon the Board fixed the first of

March as the time when they should leave.

The various members of the Board testifying on the subject gave the statement of Mrs. Albright in somewhat different language, but all of the same import. At page 79 Mr. Hiatt was questioned,

"Q. And you tell in your own words what took place at that time?

A. Well, Mr. and Mrs. Albright were asked back into the room. As soon as Mr. and Mrs. Albright came in, Mrs. Albright turned around to the Board and she said, 'We understand,—we know that we are going to have to leave. We ask this Board to give us until the first day of March so that we can get ready.' Mr. Albright says 'It would be pretty hard for him to O. K. these bills.' I do remember that being said. And thereupon it was discussed and the Board decided they would leave Mr. and Mrs. Albright stay until the first day of March."

And at page 91, on cross-examination:

"A. Armstrong said that we possibly had better make arrangements to dispose of Mr. Albright immediately.

Q. Immediately?

A. And I objected for the simple reason I didn't think Mr. and Mrs. Albright could get out immediately; that would be almost impossible, and I didn't think the case was strong enough to just shove them right out. So Mr. and Mrs. Albright,—we discussed it there in the meeting and so we had kinda agreed that they could stay awhile until things were taken care of and the boys told me to go and call Mr. and Mrs. Albright, well, I called them down, went to the stairway and called them. They came in. It was then that Mrs. Albright said that 'We know that we are going to have to leave and we ask that we be permitted to stay until March first.' "

"Q. Didn't you tell them when they came down, you called them down to tell them, that you had discharged them?

A. Yes, but Mrs. Albright said this before even a member of our Board had a chance to say a word."

And continuing on page 92:

"A. No, no, the meeting was not over when we called them down. In fact, the meeting had just begun, I would say, because they were supposed to have been notified after they came down. Well, as soon as they came into the office Mr. Albright sat there on the desk and Mrs. Albright stood right by the register by the window and Mrs. Albright turned around to the Board; she says, 'Now, I know that we are going to have to go, but we are going to ask this Board to leave us stay until March 1st'."

Mr. Detrick, another member of the Board, on direct examination at page 114, said:

"A. And we concluded we would try to recover the amount before we proceeded with the removal, and after having agreed upon that we asked them to return to the room, and which they did. On entering the room the Mrs. made the remark that 'We know we would have to get out, but she thought that there was considerable fuss made about the matter of $500.00, * * * .' "

William Kurz, another member of the Board, on direct examination at page 133:

"Q. Do you recall anything that was said by either Mr. or Mrs. Albright when they returned?

A. The only real thing that I can remember, really, that Mrs. Albright says, 'I guess we are out'. Maybe not just these words, 'We know we will have to go; we would like to have at least time to March 1st', which was granted by the Board.

"Q. Then did Mr. Albright say anything to the contrary?

"A. He didn't say anything at all."

And Mr. Haber, at page 144:

"A. There was a statement had been made to them that the Board had to be called together to take notice of the irregularities and Mrs. Albright stated, 'Well, we know we will have to move'."

And Mr. Staley, the Prosecuting Attorney, in testifying with respect to the conference between him and the Albrights at his office on Sunday afternoon prior to the meeting of the Board, said at page 105:

"One of the things that I said to them was, regardless of what else happened they probably would have to leave the Children's Home, and Mrs. Albright, I believe it was, said—made this reply to that statement that they knew that they would have to leave, and they were ready to leave. But she said they would like to have a reasonable length of time to get their affairs —their belongings gathered up."

This witness also testified, page 104 of the record:

"Q. At that whether or not they said anything about concerning making up any shortages?

"A. Yes, they did. Mr. Albright said that he was going to pay all that he owed to the county and pay everybody else connected with the Children's Home in full. I asked him if he knew what—how much he owed, and he said he didn't know exactly how much it was but he knew approximately. I asked him where he was going to get the money. He said he had an insurance policy that had a cash value sufficient to pay that."

This language of Mrs. Albright in the presence of her husband was tantamount to a resignation. In any event it was a voluntary expression of acquiescence by the plaintiffs in the action of the Board if it removed them. The action was taken without any statement from any member of the Board as to what had been done in the meeting prior to the plaintiffs' arrival. So that, it could not have been brought about from any appreciation that the Board had then taken any formal action to remove the plaintiffs.

The resultant effect of the acts of the plaintiffs and the statement of Mrs. Albright in the presence of her husband was complete without respect to, and independent of, the resolution of removal. Of course, the circumstances surrounding the transactions had a very marked effect upon the plaintiffs to bring about their resignation to the fact that they would have to leave the Home, but they appreciated this condtion and so expressed themselves. This was brought about not by duress, but by their voluntary judgment of the appropriate step which they had concluded to take.

Upon this record there can be little doubt that had the Board prepared a written resignation immediately after the statement of Mrs. Albright, plaintiffs would readily have signed it and this would have been the appropriate procedure. The Board, however, having started its deliberations upon the basis of action of removal, went ahead on that line, although, it would not have been necessary. If the Board had passed no resolution of removal it would have had the basis of an action of removal against the plaintiffs as of March 1, 1940, upon Mrs. Albright's own voluntary statement.

We cannot find upon this record that the copy of the resolution removing the plaintiffs was furnished them or either of them because it does not definitely appear that the registered letter addressed to Mr. Albright was received by him, and the statement of the cook at the Home, Mrs. Grote, that Mrs. Albright said that the Mister had received the letter, if true, would not establish its receipt against the denial of Mr. Albright that he had received it. In **State ex rel v Barnell, 109 Oh St 260,** it was held that leaving copy of charges at residence of relator was sufficient notice. If, however, it is essential that

it appear that §486-17a GC in all material particulars was observed by the Board in the removal of the plaintiffs, such proof is not forthcoming. But the right of the plaintiffs to explain any charges against them was, in our judgment, waived, when, with full knowledge of the circumstances under which the Board was proceeding, they anticipated the action of the Board and expressed a willingness to leave the institution conditioned only upon an extender of time until March 1, 1940, in which to remove. That with knowledge of their rights, plaintiffs agreed to leave their positions is accentuated by the fact that they did, on February 29, 1940, vacate their residence at the Home and no steps whatever were taken by them or either of them to be reinstated until considerable time had elapsed after the trial of Mr. Albright on the embezzlement charge. All of their actions were consistent with the statement of Mrs. Albright to the Board on the night of February 12, 1940, to effect that they realized that under all the circumstances they must leave the institution, until in May, 1940, when they corresponded with the Board of Trustees of the Home and the Civil Service Commission, asserting their rights to be restored to their former positions.

The written communication of Mr. Haber, acting as Secretary for the Board at its meeting of February 12, 1940, to the Civil Service Commission, in which he stated that Mr. Albright had accepted the order of the Board of Trustees and vacated the Children's Home, signed statement of misappropriation of funds, surrendered a life insurance policy to apply on his shortage, was substantially true, and being true, the Civil Service Commission had the right to assume that the plaintiffs no longer sustained the relationship of Superintendent and Matron respectively, to the Home.

Upon full and fair consideration of this whole record and the facts and circumstances therein appearing, the plaintiffs have not made a case which impels this Court to hold that they have established a clear right to a writ of mandamus in their behalf as prayed.

GEIGER, PJ. & BARNES, J., concur.